McKAY, Circuit Judge,
dissenting.
As the majority notes, when the officer and the dog first approached Mr. Williams, the dog
placed her nose in the immediate vicinity of Mr. Williams’s waist and groin area. [The dog] then sat down next to Mr. Williams, thus alerting her handler to the likely presence of drugs on [Mr. Williams].
Mr. Williams asked the officers what their dog was doing. Detective Griego responded that [the dog] was a drug detection dog. Officer Lucero then requested to see Mr. Williams’s bus ticket and identification, and explained that he and Detective Griego were police offi *1276 cers attempting to interdict drug traffic through the bus station.
Maj. Op. at 1271. At that point, Mr. Williams stated that he did not have any drugs and gave the officers permission to search his bag. Officer Lucero searched Mr. Williams’s bag and then asked him if he could do a pat-down search of his person. In apparent compliance with Officer Lucero’s request, Mr. Williams began unbuttoning his coat, but then he suddenly turned and ran. As he fled, he threw a small gray package onto a roof. Shortly after this, Mr. Williams was apprehended and arrested. Officers then retrieved the package, which contained approximately 1.2 pounds of cocaine base.
The majority’s flat assertion that “a reasonable innocent person in these circumstances would not feel sufficiently accused by such behavior to transform the encounter into a seizure,” Maj. Op. at 1275, is contrary to my judgment about a reasonable person. These drug dogs are not lap dogs. They typically are large, and to many ordinary innocent people, fearsome animals. For decades, the images of the Sixties civil rights’ protests have impressed on our collective awareness the image of similar dogs, with handlers holding their leashes, viciously attacking innocent protesters. This public consciousness is reenforced by reports of leashed dog attacks like the one involved in the recent nationally-tracked conviction of a California lawyer whose leashed dog killed her innocent neighbor in the hallway of their apartment building. Television news reports of police dogs being used to subdue suspects are common.
When, as in this case, a drug dog shoves its nose in a person’s groin, and the person is told that the dog is searching for drugs, the notion that an innocent person would not feel constrained-but free to leave unmolested-strains my credulity. It seems to me that one would feel more restrained than if the officers had their guns drawn. Indeed, the frequent use of police dogs rather than guns tends to confirm the collective police judgment about the relative difference in intimidating effect. Add to that the real possibility that the presence of a few $20 bills in an innocent person’s pocket could produce a positive drug dog response, and I cannot but conclude that this encounter matured into a seizure before the defendant fled.
The differing judgments about the response of the judicially defined “innocent” person also has implications for the issue we do not reach — whether an individualized drug dog sniff of one’s person constitutes a search. But it is sufficient for present purposes to note that my sense of “reasonable expectations of privacy” indicates that a search dog sniffing the groin of a person is much more unreasonable than the passive use of thermal imagery on one’s house. See generally Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). At the very least, before we declare such encounters “reasonable,” or free from seizure implications, we ought to be informed of how widespread the fear of dogs, far short of cynophobia, is among reasonable and innocent persons. While the “reasonable person” and the “innocent person” are legal fictions created by the courts, before we settle the matter, we ought at least to examine what can be known of common human behavior before we ratify police dog handler behavior which on its face seems repugnant.
The majority misses the point by dismissing the above comments as not grounded in the record. The comments are specifically directed to the majority’s assertions about what a “reasonable person” would do. The reasonable person of our case law has historically come from the minds and experience of judges, not from the record.
*1277 I would hold that there was a seizure, unsupported by reasonable suspicion, and that the subsequent drug discovery was the fruit of that unlawful seizure.