LAWSON, J.
Glover Fred Calloway appeals an order denying his dispositive motion to suppress, entered prior to his plea of nolo contende-re to charges of possession of a weapon by a convicted felon and possession of twenty grams or less of cannabis. Finding that the motion to suppress should have been granted, we reverse.
Law enforcement received an anonymous tip that Calloway was involved in unspecified “drug activity” at his residence at a certain address in the City of Orlando, in Orange County, Florida. Orlando Police Department officers properly recognized that the tip, standing alone, would not justify a warrant, a search of the residence, or the detention of Calloway. See Alabama v. White, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Although the officers did watch the house from a distance for some period of time, they did not observe anything suspicious and decided to conduct a “knock and talk” at the residence. One uniformed officer positioned himself at the front door and a second uniformed officer positioned himself at the corner of the house, to watch a second entrance at the side of the house. The officer at the front door began knocking, and no one responded. However, the second officer observed Calloway open the side door and step partially out with one foot. When Calloway saw the uniformed officer, he exclaimed, “oh shit,” and went back into the house.[1]
The officers then began knocking loudly on the side door. After approximately two minutes of continuous knocking (accompanied by repeated announcements that it was the police at the door), Calloway’s mother opened the side door while another occupant (the mother’s boyfriend) opened the front door. The officers ordered both the mother and her boyfriend out of the house, and also began ordering Calloway out of the house “with his hands up.” When Calloway complied, the officers ordered Calloway to the ground and hand *279 cuffed him, then conducted a “protective sweep” of the house, to confirm that it contained no other occupants. Following Calloway’s detention, Calloway volunteered that he had marijuana in the house, and his mother authorized a search of the house[2] — during which the officers found the marijuana (with Calloway’s assistance), and also located a firearm in Calloway’s bedroom (on a top shelf, in a closet, between shirts). The officers testified that the residence was located in a high crime area.
In denying Calloway’s motion to suppress, the trial judge seems to have found that the officers’ initial action of ordering all occupants out of the house and cuffing Calloway was justified based upon Callo-way’s “flight” (back into the house) upon seeing the officers “in a high crime area.” See Illinois v. Wardlow, 528 U.S. 119, 124-25, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (holding that a defendant’s “unprovoked flight upon noticing the police” in a high-crime area was suggestive of wrongdoing and therefore provided reasonable suspicion justifying an investigatory detention). There are at least two problems with applying Wardlow here. Both stem from the fact that, unlike Wardlow, this case deals with a person’s reasonable expectation of privacy in his or her home. See, e.g., Kyllo v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (“[T]he right of a man to retreat into his own home and there be free from unreasonable governmental intrusion” stands “[a]t the very core” of the Fourth Amendment.); Payton v. New York, 445 U.S. 573, 601, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (discussing the “overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic.”); Kirk v. Louisiana, 536 U.S. 635, 637, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002) (noting that the Fourth Amendment draws a “firm line at the entrance to the home,” and thus, the police need both probable cause to either arrest or search and exigent circumstances to justify a non-consensual warrantless intrusion into a home).
First, applying Wardlow to a “knock and talk” encounter at a home would mean that those living in a high crime area would also suffer a lower level of constitutional protection against unwarranted police intrusion than those living in more desirable neighborhoods. The result would be irreconcilable with our Fourth Amendment jurisprudence, and completely unacceptable.
Second, a “knock and talk” is only justified as a consensual encounter during which officers are authorized to “approach a dwelling on a defined path, knock on the front door, briefly await an answer, and either engage in a consensual encounter with the resident or immediately depart.” Powell v. State, 2013 WL 2232319, 120 So.3d 577 (Fla. 1st DCA May 22, 2013) (citing Nieminski v. State, 60 So.3d 521, 526 (Fla. 2d DCA 2011); Waldo v. State, 975 So.2d 542, 543 (Fla. 1st DCA 2008)). Given the consensual nature of the contact, of course, a resident is supposed to have the option of refusing to open the door. Kentucky v. King, — U.S.-,-, 131 S.Ct. 1849, 1862, 179 L.Ed.2d 865 (2011) (whether knock is by “police officer or a private citizen, the occupant has no obligation to open the door or to speak.”). *280 Allowing police to use a resident’s reaction to their presence at the home and contemporaneous clear expression of unwillingness to engage with the officers as “reasonable suspicion” to justify hauling the resident out of the home for a forced encounter would obviously render the consensual nature of the encounter illusory.
For these reasons, we hold that Wardlow does not apply to these facts. Accordingly, even in a high crime area, police conducting a “knock and talk” are not authorized to order the resident from the home or detain him, even if he opens the door and steps out briefly, but then retreats into the home upon seeing the police.
On appeal, the State also adds that the facts relayed to the officers prior to approaching the house (from the anonymous tip), when combined with Callo-way’s flight upon seeing uniformed officers in a high crime area would be enough to give them reasonable suspicion of criminal activity, thus justifying their detention of Calloway. We reject this argument for the same reasons. Officers using the “knock and talk” procedure will invariably be armed with some information similar to the tip in this case when they approach the front door of a home in an attempt to engage the occupants in a consensual conversation. If they could then use an occupant’s firm desire to avoid police by retreating into the house, or shocked reaction at seeing police, as the only extra information necessary to confirm whatever suspicion brought them to the door in the first place, it would render the consensual nature of the knock and talk procedure completely illusory and unjustifiably erode “the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion”—which stands “[a]t the very core” of our Fourth Amendment protections. Kyllo, 533 U.S. at 31, 121 S.Ct. 2038. We therefore hold that the officers violated the occupants’ Fourth Amendment rights by ordering them from their home, and further violated Callo-way’s Fourth Amendment rights by handcuffing and involuntarily detaining him.
Calloway’s later admission regarding the presence of marijuana in the house was a fruit of the illegal detention, and could not be used to justify the subsequent search. United States v. Flores-Sandoval, 422 F.3d 711, 714 (8th Cir.2005) (evidence “obtained by exploitation of [an unlawful detention] instead of by means sufficiently distinguishable to be purged of the primary taint” must be excluded). His mother’s consent to search the home was also tainted by the officer’s illegal order that everyone vacate the home. See, e.g., Turner v. State, 674 So.2d 896, 897 (Fla. 5th DCA 1996) (“A consent to search given after illegal police conduct is presumptively tainted and is deemed involuntary absent ‘clear and convincing proof of an unequivocal break in the chain of illegality sufficient to dissipate the taint of prior official illegal action.’ ”) (quoting Norman v. State, 379 So.2d 643, 647 (Fla.1980)). As such, Calloway’s motion to suppress should have been granted.
Accordingly, we reverse Calloway’s convictions and sentences, along with the suppression order, and remand with directions that the trial court suppress the evidence against Calloway.
REVERSED AND REMANDED WITH DIRECTIONS.
BERGER and WALLIS, JJ., concur.

. The officer who observed Calloway step partially out of the side door testified that he "went back into the house,” but also said that he "ran back inside the house.” Given that Calloway only had one foot outside of the threshold, his retreat into the house would have spanned less than a full step. We fail to see how this small movement could fairly be characterized as running, although that is the description that the State latches onto for its analysis. The trial court also ultimately found that Calloway's detention was justified "based on [his] flight" at the sight of police. Although questionable, for purposes of this analysis we accept the trial court’s finding that Calloway’s reaction to the sight of police constituted "flight.”

. Calloway’s mother testified that she did not authorize the officers’ initial entry into the home to conduct the protective sweep, and that she only later consented to the search of her home because the officers threatened that if she withheld her consent they would come back with a search warrant and "tear the house up.” The trial court rejected this testimony and found that Calloway’s mother freely and voluntarily consented to the search of her home. We accept this finding, which is supported by the officers’ testimony.