# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v

CLYDE RICHARD GREEN,

        Defendant-Appellee.

UNPUBLISHED
April 9, 2015

No. 323433
Iosco Circuit Court
LC No. 13-008088-FH

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v

SANDRA JUNE GREEN,

        Defendant-Appellee.

No. 323435
Iosco Circuit Court
LC No. 13-008087-FH

Before: WILDER, P.J., and SERVITTO and STEPHENS, JJ.

PER CURIAM.

In these consolidated interlocutory appeals, the prosecution appeals by leave granted an order of the trial court granting in part defendants' motion to suppress evidence based on an illegal search of the premises in issue.[1] We reverse and remand.

On August 21, 2013, Michigan State Police Trooper Bradley Campbell went to defendants' residence to investigate a complaint made regarding abandoned animals on the property and lack of electricity at the home. As he approached the home, Campbell immediately smelled urine, feces, and dead animals. He knocked on the front door in an attempt to make

---

[1] *People v Green*, unpublished order of the Court of Appeals, entered October 2, 2014 (Docket No. 323433); *People v Green,* unpublished order of the Court of Appeals, entered October 2, 2014 (Docket No. 323435).

contact with the residents, but received no response. He testified that, based on a previous visit to the residence in November 2012, at which time he made contact with the residents in a pole barn on the property, he thought the residents might be there. As he walked down to the pole barn, which was about 80 yards from the house, he stepped over a single-wire electric fence that provided a barrier to confine horses. Campbell saw dead rabbits in various stages of decomposition in cages outside the pole barn. He walked around the pole barn to the south side, where the barn door was completely open. As he approached the pole barn door, he saw a cage just inside that contained a dead rabbit and a dead guinea pig.

After failing to locate anyone, Campbell made contact with defendants' neighbor, Nathan Proper. Proper told Campbell that defendants' children were supposed to be taking care of the animals, but he had not seen anyone at the property in a few days. Proper stated that there was no electricity to the property and that he had been providing electricity for the fence and providing a water line for the animals. At that point, Campbell left the property and obtained a search warrant. Officers subsequently executed the search warrant and seized 31 dogs, 6 guinea pigs, and between 100 and 200 rabbits. An expert in veterinary medicine testified that the dogs were universally underweight and infested with fleas, roundworms, hookworms, whipworms, and tapeworms. He also found parasites in the guinea pigs. He testified that the magnitude of the parasite infestation is evidence of the unsanitary conditions in the whole environment of defendants' property, because several of the parasites can only exist in a situation where there is recurring fecal contamination. He explained that the situation warranted impound of the animals.

Defendants moved to suppress all evidence obtained during Campbell's visit to the home, as well as all evidence subsequently derived from the execution of the search warrant. As relevant to the issue on appeal, defendants asserted that the search warrant was issued on the basis of facts unlawfully obtained by Campbell.[2] Defendants argued that Campbell was trespassing on the property and that he went to the pole barn solely on a "fishing expedition" because he knew that no one was there. After hearing testimony on the issue, the trial court denied the motion to suppress evidence obtained from the search of the house pursuant to the search warrant, but granted the motion to suppress evidence found in and around the pole barn. The court concluded that Campbell had "no reason" to go to the pole barn. The court commented that Campbell "[c]ould have yelled and asked for somebody" instead of going out to the pole barn.

Plaintiff now argues that the trial court erred in granting defendants' motion to suppress the evidence found in and around the pole barn. In a suppression hearing, we review the trial

---

[2] Although both sides argued below about the validity of the affidavit supporting the search warrant, and defendants reiterate their argument in their brief on appeal, that issue is not pertinent here because the court found probable cause to support the warrant. Defendants have not sought leave to appeal that decision. The court only suppressed evidence taken from the pole barn on the basis of Trooper Campbell's conduct with respect to the pole barn before he obtained the search warrant.

court's ultimate decision de novo, but review the trial court's findings of fact for clear error. *People v Barbarich (On Remand)*, 291 Mich App 468, 471; 807 NW2d 56 (2011). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made." *Id.*

Both the United States and Michigan Constitutions protect citizens from unreasonable searches and seizures by the government. US Const, Am IV; Const 1963, art 1, § 11; *Herring v United States*, 555 US 135, 136; 129 S Ct 695; 172 L Ed 2d 496 (2009); *People v Slaughter*, 489 Mich 302, 310-311; 803 NW2d 171 (2011).[3] However, in order to implicate these protections, the government must first commit a search, which is defined as an intrusion on a person's reasonable or justifiable expectation of privacy. *People v Taylor*, 253 Mich App 399, 404; 655 NW2d 291 (2002); see *Katz v United States*, 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967). Even where an area is protected, "[a] mere 'technical trespass' [does] not transform an otherwise reasonable investigation into an unreasonable search." *People v Houze*, 425 Mich 82, 93; 387 NW2d 807 (1986); see also *United States v Jones*, 565 US ___, ___ n 5; 132 S Ct 945, 950-951; 181 L Ed 2d 911 (2012) (explaining that a "[t]respass alone does not qualify [as an unreasonable search], but there must be conjoined with that . . . an attempt to find something or to obtain information").

This Court evaluates a search under the totality of the circumstances in determining whether the intrusion violated both a person's subjective (actual) and objective (reasonable) expectation of privacy. *Taylor*, 253 Mich App at 404-405. Unless there is a valid exception to the warrant requirement, any evidence obtained from a search or seizure performed without a warrant is suppressed. *People v Dagwan*, 269 Mich App 338, 342; 711 NW2d 386 (2005).

Here, the parties disputed the validity of Trooper Campbell's initial approach of the pole barn in attempting to locate defendants. Plaintiff contends that Campbell attempted to locate defendants pursuant to a "knock and talk" procedure, which has been accepted as constitutionally valid by this Court under *People v Frohriep*, 247 Mich App 692, 697; 637 NW2d 562 (2001). As established in *Frohriep*, a knock and talk procedure is:

> [A] law enforcement tactic in which the police, who possess some information that they believe warrants further investigation, but that is insufficient to constitute probable cause for a search warrant, approach the person suspected of engaging in illegal activity at the person's residence (even knock on the front door), identify themselves as police officers, and request consent to search for the suspected illegality or illicit items. [*Id.* at 697.]

The trial court found that Campbell exceeded the scope of the initial knock and talk procedure by continuing to search for defendants at the pole barn, because the pole barn was too distant from the house. It therefore concluded that Campbell was not lawfully on the premises when he

---

[3] Unless there is a "compelling reason" to impose a different interpretation, the Michigan Constitution is to be construed to provide the same protection as the Fourth Amendment to the United States Constitution. *Slaughter*, 489 Mich at 311.

observed the dead animals in and around the pole barn and, therefore, that he conducted an illegal search.

However, the proper inquiry is whether the area (pole barn) was within the curtilage of the home and therefore subject to a reasonable expectation of privacy. As a general rule, "the Fourth Amendment viciously protects one's privacy interest in the home[.]" *Taylor*, 253 Mich App at 406; see also *Kyllo v United States*, 533 US 27, 31; 121 S Ct 2038; 150 L Ed 2d 94 (2001) (internal quotation marks and citation omitted) ("At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."). For purposes of the constitutional protection against unreasonable searches and seizures, the curtilage of the home is considered part of the home itself. See Const 1963, art I, § 11; *United States v Dunn*, 480 US 294, 300; 107 S Ct 1134; 94 L Ed 2d 326 (1987); *Oliver v United States*, 466 US 170, 180; 104 S Ct 1735; 80 L Ed 2d 214 (1984).

A determination of whether an area constitutes part of the curtilage is guided by a four-factor test, as set forth by the Court in *Dunn*, 480 US at 301. The factors are "[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by." *Id*. The *Dunn* Court counseled against a "mechanical" application of these factors, but instead indicated that the factors are "useful . . . only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id*.

As clearly established in *Dunn*, people do not enjoy a reasonable expectation of privacy in areas outside the curtilage, which is the "area around the home to which the activity of home life extends." *Dunn*, 480 US at 302-304. *Dunn* concluded that large fields not contained within an immediate fence surrounding the defendant's residence and a detached barn located 50 to 60 yards from the suspect's home were not within the curtilage of the home. *Id.* at 304. "Standing in isolation," the Court concluded, "this substantial distance supports no inference that the barn should be treated as an adjunct of the house." *Id.* at 302. The Court also found it:

> significant that respondent's barn did not lie within the area surrounding the house that was enclosed by a fence. We noted in *Oliver* [*v United States*, 466 US 170; 104 S Ct 1735; 80 L Ed 2d 214 (1984)], that "for most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage—as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience." 466 U.S., at 182, n. 12, 104 S.Ct., at 1743, n. 12. Viewing the physical layout of respondent's ranch in its entirety, . . . it is plain that the fence surrounding the residence serves to demark a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house. Conversely, the barn—the front portion itself enclosed by a fence—and the area immediately surrounding it, stands out as a distinct portion of respondent's ranch, quite separate from the residence. [*Dunn*, 480 US at 302.]

"It is especially significant," the Court continued, "that the law enforcement officials possessed objective data indicating that the barn was not being used for intimate activities of the home." *Id.* Finally, the Court found that the defendant "did little to protect the barn area from observation by those standing in the open fields." *Id.* at 303. The Court explained that under the circumstances, the police did not commit an unreasonable search by circling the barn and peering inside it with flashlights. *Id.*

Application of the *Dunn* factors in the case at hand supports a finding that the pole barn is not within the home's curtilage. The distance between the pole barn and the residence in the present case is greater than the distance between the house and its respective structure in *Dunn*, which was found to be outside the curtilage. The single-wire electric fence surrounding the area where the pole barn is located served as a barrier to confine horses and was not demarcating the cartilage and was easily stepped over. The pole barn was also not in an area where the intimate daily activity of defendant's life extended. See *United States v Potts*, 297 F2d 68, 69 (CA 6, 1961). The pole barn was surrounded by overgrown grass and contained cages that housed rabbits and guinea pigs and that were piled with feces. Cages were also immediately outside the pole barn that contained dead animals. The barn itself was not used for family purposes. Moreover, "[a]n individual may not have a reasonable expectation of privacy, even in areas close to the principal residence, such as will allow them to be treated as the curtilage, when those areas are readily accessible and visible to the public." 68 Am Jur 2d, Searches and Seizures, § 69, p 184. The pole barn was visible to the public from the road.

In sum, we conclude that defendants' pole barn did not constitute part of the curtilage of the home. Because defendants did not have a reasonable expectation of privacy in regard to the pole barn, the search of defendants' premises did not violate their Fourth Amendment rights because the conduct of the police in approaching the pole barn was not a search that implicated constitutional protections. The evidence consequently discovered pursuant to a search warrant should not have been suppressed by the trial court.

Reversed and remanded. We do not retain jurisdiction.

/s/ Kurtis T. Wilder
/s/ Deborah A. Servitto
/s/ Cynthia Diane Stephens