******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JOHN PANEK
(AC 36820)

DiPentima, C. J., and Sheldon and Prescott, Js.

*Argued October 22, 2015—officially released July 5, 2016*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, geographical area number twenty,
Wenzel, J.)

*Denise B. Smoker*, senior assistant state's attorney,
with whom, on the brief, were *David I. Cohen*, state's
attorney, and *Nichol Peco*, assistant state's attorney, for
the appellant (state).

*William B. Westcott*, for the appellee (defendant).

*Opinion*

SHELDON, J. This case concerns the ultimate facts that the state must plead and prove to convict a defendant of voyeurism under General Statutes § 53a-189a, Connecticut's video voyeurism statute.[1] Section 53a-189a was enacted by the legislature in 1999, and it now provides in relevant part: "(a) A person is guilty of voyeurism when, (1) with malice, such person knowingly photographs, films, videotapes or otherwise records the image of another person (A) without the knowledge and consent of such other person, (B) while such other person is not in plain view, and (C) under circumstances where such other person has a reasonable expectation of privacy, or (2) with intent to arouse or satisfy the sexual desire of such person or any other person, such person knowingly photographs, films, videotapes or otherwise records the image of another person (A) without the knowledge and consent of such other person, (B) while such other person is not in plain view, and (C) under circumstances where such other person has a reasonable expectation of privacy. . . ."

So framed, the statute has two parallel subdivisions, each of which establishes a separate basis for proving a defendant guilty of voyeurism thereunder. Each subdivision sets forth the five common conduct, circumstances and mental state elements of that offense plus one additional, aggravating mental state element that distinguishes the two subdivisions from one another. The first common element, which describes the conduct a defendant must engage in to commit voyeurism under either subdivision, is (1) that he photograph, film, videotape or otherwise record the image of another person. The second, third and fourth common elements, which describe the circumstances under which the defendant must engage in the proscribed conduct in order to commit either form of that offense, are that he do so (2) without the other person's knowledge and consent, (3) while the other person is not in plain view, and (4) under circumstances where the other person has a reasonable expectation of privacy. The fifth common element, which describes the mental state with which the defendant must engage in the proscribed conduct under the statutorily prescribed circumstances in order to commit voyeurism, is that he do so (5) knowingly. Finally, the sixth essential element of voyeurism, an aggravating mental state that is different under each subsection of the statute, is (6) that the defendant commit the five common elements of voyeurism either with malice, in violation of subdivision (1) of subsection (a) of the statute, or with intent to arouse or satisfy the sexual desire of himself or of another person, in violation of subdivision (2) of subsection (a) of the statute.

The question presented on this appeal is whether a defendant can be prosecuted for and convicted of voyeurism based upon allegations and proof that he

surreptitiously recorded the image of another person while he and she were engaged in consensual sexual activity with one another in a private place. This question comes before us on the state's appeal from the dismissal of three consolidated informations charging the defendant, John Panek, with violating § 53a-189a (a) (1) in that manner against three different women. The informations were dismissed on the ground that the defendant's recording his own sexual activity with another person cannot establish the third essential element of voyeurism with respect to that person, to wit: that he recorded the other person's image when she was "not in plain view . . . ." Interpreting the phrase "not in plain view," as used in the statute, to mean "not in plain view *of the defendant*," the trial court concluded that the facts alleged by the state did not tend to establish the third essential element as to any of the complainants because each was allegedly in the defendant's immediate physical presence, and thus *in his plain view*, when he recorded her image. (Emphasis added.)

The state claims that the trial court erred in so interpreting the statute, and thus in dismissing the three informations, because the meaning of its "not in plain view" element is not plain and unambiguous on the face of the statute, as the trial court ruled. It contends, to the contrary, that if the statute is properly construed in light of its legislative history, the disputed element must be understood to require only proof, as here alleged, that the complainants were "not in plain view *of the public*" when the defendant recorded their images. The defendant disagrees, and so do we. We conclude that the judgment of the trial court must be affirmed.

This case arises against the following factual and procedural background. On or about July 30, 2011, a woman with whom the defendant had recently been involved in an intimate relationship reported to officers from the Wilton Police Department that approximately three weeks earlier she had caught the defendant making a recording with his cell phone of a private sexual encounter between them in the bedroom of her New York City apartment. When she objected to his conduct in so doing, which she had not previously known of or consented to, he complied at once with her demand that he delete the recording after telling her that it was the first time he had made such a recording of them. Twelve days later, however, having decided to end her relationship with the defendant and remembering that he had a computer with a camera in it facing the bed in his home in Wilton, where he and she had previously engaged in sexual activity, she traveled to Wilton to break up with him and confront him as to whether he had other recordings of their private sexual encounters on his computer. When he admitted that he did, insisting that he had used them only for his own personal sexual gratification, she demanded that he pull them all up so

he and she could delete them together. In response to her demand, the defendant pulled up a file marked with her initials, but quickly deleted it before she could see what was in it or where in his computer files it had been stored. Over her protest that he had not complied with her demand, he stated that he had not wanted to show her where the recordings were stored because he also had recordings of other women in that location, all assertedly consented to, which he did not want her to see. Armed with this information, the Wilton police secured a warrant to search the defendant's Wilton home, including all of his computer equipment and file storage devices, for similar recordings. Thereafter, although the defendant initially had told the officers who searched his residence that he had no other unconsented-to recordings of the complainant or others in his possession, he recontacted them to tell them the names of two other women whose images he had secretly photographed, without their knowledge and consent, when they were undressed in his presence. On the basis of the foregoing information, which was subsequently set forth in an arrest warrant affidavit, the defendant was arrested and charged, in separate informations, with one count of voyeurism as to each of the three women under § 53a-189a.[2]

To test the legal sufficiency of the state's allegations to charge him with voyeurism, the defendant moved to dismiss the three informations, without procedural objection by the state,[3] under Practice Book § 41-8 (2).[4] In support of his motion to dismiss, the defendant argued that if the state's allegations were those set forth in his arrest warrant affidavit, as he and the state had stipulated for the purpose of the motion, then the state had failed to charge him with an offense because it had not alleged that he recorded the image of any of the complainants while she was "not in plain view." Contending that the perspective from which it must be determined if a complainant is "not in plain view" at the time her image is being recorded is that of the defendant, as the alleged voyeur, the defendant argued that "[i]t defies the plain requirement of the language of sub[paragraph] (B) [of the statute] for the state to claim it can prove a complainant is not in plain view of an accused in any case where that complainant has chosen to remove her clothes and engage in sexual activity with the accused. Surely, under such circumstances one could not be any more in the plain view of another." (Emphasis omitted.)

The state did not disagree with the defendant that any person who disrobes in his presence and engages in sexual activity with him puts herself in his plain view. It argued, however, that the "not in plain view" element of voyeurism should not be evaluated from the defendant's perspective, but instead from the perspective of the camera or other device he used to record the complainant's image or, in the alternative, from the

perspective of the general public.

The first of the state's alternative proposals for interpreting the disputed element was argued as follows in its memorandum in opposition to the motion to dismiss: "What the court should be focused on is where the camera/computer/phone is placed, not where the defendant is. To the victim it makes no difference. She had no knowledge of the recording device [and] therefore she was not in plain view to it." The state cited no language from the statute in support of this argument. The state's second proposal for interpreting the disputed element, which it advanced for the first time at oral argument on the motion, was that the phrase "not in plain view" should be held to mean "not in public view." Such an interpretation would be appropriate, the state argued, because it would afford the protection of the statute to all persons whose images are surreptitiously recorded by others, without their knowledge and consent, unless at the time such recordings are being made, they are knowingly exposing those parts or aspects of themselves that are being so recorded to public view. This part of the state's argument was also unsupported by any language from the statute.

On April 21, 2014, the trial court issued a memorandum of decision granting the motion to dismiss. It ruled that the "not in plain view" element of voyeurism, as set forth in § 53a-189a (a) (1) (B), plainly and unambiguously requires the state to plead and prove that when the defendant recorded the image of a complainant without her knowledge and consent, he did so while she was *not in the defendant's plain view.*

In reaching this result, the court first examined the text of the statute, as required by General Statutes § 1-2z, to determine if the legislature's intent as to the meaning of the disputed element could be discerned, plainly and unambiguously, therefrom. It concluded, on the basis of that examination, that the words "not in plain view" do indeed have a plain and unambiguous meaning as to the perspective from which it must be determined if the complainant is "not in plain view" when the defendant records her image. That meaning, it determined, is fully consistent with the defendant's proposed interpretation, namely "*not in plain view of the defendant,*" but not at all consistent with either of the alternative interpretations proposed by the state. (Emphasis added.)

"Looking for the straightforward meaning of the phrase 'plain view,' " the court declared, "is not a difficult task." The court stated further: "The word 'plain,' when used as an adjective, has several meanings. Those most applicable here are: 'clearly evident,' and 'open and without pretense.' Webster's II New College Dictionary (2001) p. 841. It is also defined as 'free of duplicity or subtlety.' Webster's Ninth New Collegiate Dictionary (1990) p. 898. In a word, it means 'obvious.'

Merriam-Webster's Dictionary, available at http://www.merriam-webster.com.

"'View,' when used as a noun, means 'the act of seeing or examining.' Webster's Ninth New Collegiate Dictionary, supra, p. 1314. It also means 'the field of vision.' Webster's II New College Dictionary, supra, p. 1231. Both of these possible meanings suggest that the act of viewing is being performed by a person.

"Utilizing these definitions, the term 'plain view' means that which can be readily observed from a certain vantage point without the benefit of any special effort or aid being utilized to view an object. The term suggests the absence of any trickery, artifice, or device being used in the viewing process such that the view in question is reasonably evident to a person being photographed. This understanding of that phrase is certainly compatible with its more common use in the context of search and seizure cases in criminal actions. See, e.g., *Horton* v. *California*, 496 U.S. 128 [134] 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990)."

"As employed in the statute," the court continued, "the phrase is used in the larger clause, 'while such other person is not in plain view.' It is clear that the other person here is the person being photographed or depicted in the video. This is not disputed by the parties. Where the state and the defendant disagree, however, is whose view is being described in the phrase 'plain view.'" Upon so framing the issue before it, the court turned to consider the state's two alternative proposals for interpreting the disputed element.

As for the state's initial proposal, that the phrase "not in plain view" should be interpreted to mean not in the view of the camera, the court first noted that the statute makes no reference to cameras or other recording devices. This, it concluded, is appropriate because "the word 'view' typically means the view of a person," not the view to or from a recording device. The court found support for this conclusion in the legislature's use of the phrase "not in plain view" in the disorderly conduct statute, General Statutes § 53a-182 (a) (7), in which in 2001, just two years after enacting the video voyeurism statute, it made "Peeping Tom" behavior punishable as a form of disorderly conduct. The conduct prohibited by § 53a-182 (a) (7) involves observing another person in other than a casual or a cursory manner, while committing a simple trespass, in the following circumstances: without the other person's knowledge and consent, while the other person is inside a dwelling and not in plain view, and where the other person has a reasonable expectation of privacy. The court found that the phrase "not in plain view," as used in that statute to describe a circumstance under which a defendant must have engaged in a particular type of surreptitious observational behavior in order to commit disorderly conduct, "clearly pertains to the view of a person

. . . ." It pertains, more particularly, to the view of the defendant as the person alleged to have engaged in such surreptitious observational behavior. The court found that this usage is "plainly inconsistent" with the state's proposed interpretation of the same language in this case "that the 'view' in question is that of a camera or recording device . . . ." "When," the court concluded, "the legislature has used identical language to address very similar concerns and at virtually the same point in time, this court is reluctant to accord very different meanings to identical phrases."

As for the state's second proposal, that the phrase "not in plain view" might alternatively be interpreted to mean "not in public view," the court rejected that proposal based upon the common-law principle that "[n]o part of a legislative enactment is to be treated as insignificant or unnecessary, and there is a presumption of purpose behind every sentence, clause or phrase [such that] no word in a statute is to be treated as superfluous." It found, more specifically, that the state's fallback proposal for interpreting the disputed element would render superfluous the fourth essential element of voyeurism, which, to reiterate, requires proof that the defendant recorded the complainant's image "under circumstances where [she] ha[d] a reasonable expectation of privacy." Impliedly construing the term "reasonable expectation of privacy" in accordance with its settled meaning under controlling federal case law enforcing the fourth and fourteenth amendment right against unreasonable searches and seizures, the court concluded that under the statute, as under such federal case law, a person has no privacy interest in, and thus no reasonable expectation of privacy as to, any aspect of her person, property or activities which she knowingly exposes to public view. See *Katz* v. *United States*, 389 U.S. 347, 360, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring). On that basis, the court concluded that the "not in plain view" element of voyeurism cannot appropriately be interpreted to require proof that the defendant recorded the complainant's image while she was "not in public view," for if it were so interpreted, both it and the "reasonable expectation of privacy" element of that offense would improperly be deemed to have the same core meaning, to wit: that the defendant recorded the complainant's image while she was "not in public view." The court thus agreed with the defendant that the "not in plain view" element of voyeurism cannot mean that the complainant was "not in public view" when the defendant recorded her image, but instead must mean that she was "*not in plain view of the defendant*" at that time. (Emphasis added.)

Finally, the court found support for its conclusion that the perspective from which the "not in plain view" element of the statute must be evaluated is that of the defendant in the name and nature of the conduct which the statute seeks to criminalize. Dictionaries define

"voyeurism," the court noted, as " '[g]ratification derived from observing the sexual organs or acts of others, usu[ally] secretly.' " Voyeurism thus inherently involves the surreptitious invasion of another person's privacy by secretly observing her. By requiring proof that the complainant was not in the defendant's plain view at the time he recorded her image, the video voyeurism statute restricts the scope of liability for voyeurism to conduct that is fairly describable as voyeuristic because it involves or results from secretly, rather than openly and obviously, recording the image of the complainant under circumstances constituting an invasion of her privacy.

Applying the foregoing definition of "plain view" to the allegations set forth in the defendant's arrest warrant affidavit, and thus by stipulation in the three challenged informations, the court concluded that the state had "fail[ed] to state any factual basis on which . . . the crimes alleged . . . occurred while the subjects of the depictions were not in plain view of the defendant . . . ." The court thus dismissed the three informations on the ground of failure by the state to charge the defendant with an offense. This appeal followed.

## I

The state has raised a single claim of error on this appeal. It claims, expressly, that "the trial court erred in construing the term 'not in plain view' in . . . § 53a-189a to mean not in the defendant's plain view and in granting his motion to dismiss because the victims were in his sight when he surreptitiously photographed and/ or videotaped them having sex with him."

"The requirements of the statute present a question of statutory construction over which we exercise plenary review. . . . When construing a statute, our fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . [General Statutes] § 1–2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretative guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation. . . . We presume that the legislature did not intend to enact meaningless provisions. . . . [S]tatutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant . . . .

"[W]hen the statute being construed is a criminal statute, it must be construed strictly against the state and in favor of the accused. . . . [C]riminal statutes [thus] are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant. . . . Rather, penal statutes are to be construed strictly and not extended by implication to create liability which no language of the act purports to create. . . . Further, if, after interpreting a penal provision, there remains any ambiguity regarding the legislature's intent, the rule of lenity applies. It is a fundamental tenet of our law to resolve doubts in the enforcement of a [P]enal [C]ode against the imposition of a harsher punishment." (Citations omitted; internal quotation marks omitted.) *State* v. *Drupals*, 306 Conn. 149, 159–160, 49 A.3d 962 (2012).

The state argues on appeal that that phrase "not in plain view," as used in the statute, is ambiguous, and thus that the statute must be construed in light of its legislative history, the circumstances surrounding its enactment, the legislative policy it was designed to implement and other accepted tools of statutory construction. Although the state acknowledges that one reasonable interpretation of the disputed element is "not in plain view of the defendant," as the trial court ruled, it insists that another reasonable interpretation of the element is one of the two it advanced in opposition to the motion to dismiss, namely "not in public view." The state contends that the latter interpretation of the disputed element is supported by the comments of legislators appearing in the statute's legislative history.

The defendant disagrees, arguing first, as he did before the trial court, that the phrase "not in plain view" need not be construed on the basis of extratextual evidence because its plain and unambiguous meaning, as the trial court properly determined, is "not in plain view of the defendant." This conclusion, he argues, is well supported both by the language of the statute and by the statute's relationship to other statutes, particularly § 53a-182 (a) (7), where, as the trial court noted, identical language is used in a similar context to describe an essential element of a related criminal offense. The defendant further contends that even if the language of the disputed element is ambiguous on its face, and must therefore be construed, the trial court's interpretation of that element finds substantial support in the statute's legislative history. Even, then, if there were any ambiguity as to the meaning of that element after the statute is construed, which he denies, any such ambiguity would have to be resolved in his favor either by ruling the statute unconstitutionally void for vagueness because of its lack of clear meaning or by construing it in his favor under the rule of lenity, which in either case would require that the trial court's judg-

ment be affirmed. We agree with the defendant that the trial court properly interpreted the disputed element in light of the plain and unambiguous language of the statute, and thus conclude that its judgment must be affirmed.

Looking first, as we must, at the language of the statute, we note initially that the phrase "not in plain view" is not defined therein or in any other provision of the General Statutes. Therefore, in the absence of controlling case law construing that phrase in this or any related statutory context, we are directed by General Statutes § 1-1 (a) to construe it "according to the commonly approved usage of the language," unless it has "acquired a peculiar and appropriate meaning in the law [and therefore] shall be construed and understood accordingly."

In standard English usage, as the trial court noted, the word "plain," when used as an adjective, has several meanings. We find that the most applicable meanings here are: "free of impediments to view" and "unobstructed." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) (available at http://www.merriam-webster.com). The word "view," when used as a noun, means "the extent or range of vision" or "the act of seeing or examining." Id. Both of these possible meanings, as the trial court observed, "suggest that the act of viewing is being performed by a person."

Combining these definitions together, and applying them to the view of one person by another, the person being observed by another person is "in plain view" of the other person when she is so situated that the other person can readily or easily view her from his vantage point, without impediments or obstructions to his view.

The trial court reached a similar conclusion, determining that " 'plain view' means that which can be readily observed from a certain vantage point without the benefit of any special effort or aid being utilized to view an object." It added, however, that "[t]he term suggests the absence of any trickery, artifice, or device being used in the viewing process such that the view in question is reasonably evident to a person being photographed." The court declared that this latter aspect of "plain view"—that "the view of the defendant . . . be open and obvious to [the complainant]" at the time he records her image—is "an inherent part of 'plain view' " under the video voyeurism statute. It based this conclusion not only on selected dictionary definitions of the words "plain" and "view," as previously noted, but on what it described as the compatibility of "[t]his understanding of the phrase ['in plain view'] . . . with its more common use in the context of search and seizure cases in criminal actions," as well as its consistency with the statute's use of the word "voyeurism" to describe the conduct made punishable thereunder.

The state contends in its brief that the latter conclusion placed an unnecessary judicial gloss on the "not in plain view" element of voyeurism, demonstrating that the statute is ambiguous on its face, and thus in need of construction. Although we have doubts as to whether this aspect of the trial court's interpretation of the disputed element is compelled by the plain language of the statute, we agree with the state that that issue need not have been addressed by the trial court and need not be resolved by this court to decide the narrower question raised by the defendant's motion and presented for our decision on appeal. That question, to reiterate, is from whose perspective must it be determined if the complainant in a voyeurism prosecution was "not in plain view" at the time the defendant recorded her image without her knowledge and consent?

Refocusing on that narrower question, we must first agree with the state that the text of the statute does not answer the question directly. That is, although the statute's use of the word "view" connotes the view of a person, it does not state whether the person whose view of the complainant must not have been a plain view was the defendant himself or some other person, such as a member of the general public. Its silence on that point, however, does not make this aspect of the disputed element ambiguous, for several reasons.

First and foremost, as the trial court ruled, the disputed element cannot be interpreted to mean "not in public view," as the state has argued, because the parallel, "reasonable expectation of privacy" element of the statute imposes that very same restriction on the scope of liability thereunder. As the trial court implicitly acknowledged, the term "reasonable expectation of privacy" has acquired a settled meaning under our constitutional law of search and seizure, which the legislature logically had in mind when it used that term to describe the fourth essential element of voyeurism. For over three decades before the statute was enacted, the United States Supreme Court had held that a criminal defendant can challenge, as an unreasonable search or seizure in alleged violation of his rights under the fourth and fourteenth amendments, any intrusion by agents of the government as to an aspect of his person, his property or his activities as to which, at the time of such intrusion, he had an actual expectation of privacy that society is prepared to regard as reasonable. *Katz* v. *United States*, supra, 389 U.S. 361. An actual expectation of privacy is subjective; a defendant has such an expectation of privacy as to those aspects of his person, property and activities which he actually believes to be free from governmental intrusion. See id. A reasonable expectation of privacy, on the other hand, is objective; its existence in particular circumstances depends upon the manner in which the person has attempted, in those

circumstances, to keep private those aspects of his person, property or activities which he claims to have been intruded upon by the government. See id.

Whereas a person is typically held to have a reasonable expectation of privacy as to those aspects of his person, property or activities which he has made reasonable efforts to keep private, he is universally held not to have no reasonable expectation of privacy as to those aspects of his person, property or activities which he knowingly exposes to public view. Id. Therefore, since an essential element of the state's proof of the "reasonable expectation of privacy" element of voyeurism is that at the time the complainant's image was recorded, she was not knowingly exposing those parts or aspects of herself of which an image was being recorded to public view, that same meaning cannot appropriately be attributed to the parallel, "not in plain view" element of the statute. Here, then, we agree with the trial court that because the video voyeurism statute concerns conduct involving two and only two persons, the complainant whose image was allegedly recorded without her knowledge and consent and the defendant who allegedly recorded that image of her when she was not in plain view, it must logically be the defendant as to whom the complainant was not in plain view when her image was recorded, for she will always have been in plain view of herself.

Secondly, the foregoing interpretation of the disputed element is consistent with the settled meaning of the phrase "in plain view" under controlling federal case law enforcing the plain view exception to the warrant requirement of the fourth and fourteenth amendments. Under such case law, a state or federal officer is authorized to make a warrantless seizure of any item he finds "in plain view" while lawfully performing his duties if it is immediately apparent to him, upon viewing the item without touching or manipulating it except as authorized by law, that it is lawfully subject to seizure. See *Arizona* v. *Hicks*, 480 U.S. 321, 323–27, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987). An item is lawfully subject to seizure if, for example, it constitutes the fruits, evidence or instrumentality of a crime; *Warden* v. *Hayden*, 387 U.S. 294, 310, 87 S. Ct. 1642, 18 L. Ed. 2d 782 (1967); it is contraband or it poses a danger to the public; *Cady* v. *Dombrowski*, 413 U.S. 433, 441–43, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973); or it is subject to seizure under the authority of a statute. See *Michigan* v. *Tyler*, 436 U.S. 499, 509–10, 98 S. Ct. 1942, 56 L. Ed. 2d 486 (1978). It is immediately apparent to an officer that an item is lawfully subject to seizure if the officer has probable cause to believe that it is such an item. *Horton* v. *California*, supra, 496 U.S. 136. An officer is lawfully performing his duties when he comes upon an item lawfully subject to seizure if he has the right to be where he is and to be doing what he is doing at that time, under the authority of a warrant, an exception to the warrant

requirement or otherwise. *Coolidge* v. *New Hampshire*, 403 U.S. 443, 465–66, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971). Finally, and of direct relevance here, an item is "in plain view" of the officer when he comes upon it if it is so situated in relation to him as to be readily observable by him, as he finds it, without the aid of advanced technological enhancements to vision that are not in general public use. Compare *State* v. *Dickerson*, 313 N.W.2d 526, 532 (Iowa 1981) (use of binoculars to observe, or standard photographic equipment to preserve a photographic record of, items come upon by officers while lawfully performing their duties held justified under the plain view exception to the warrant requirement of the fourth and fourteenth amendments) with *United States* v. *Epperson*, 454 F.2d 769, 770 (4th Cir.*)* (use of magnetometer to detect metal in or below the clothing of a person in plain view is not justified under the plain view exception because it constitutes a separate invasion of the searchee's privacy, for which a warrant is required), cert. denied, 406 U.S. 947, 92 S. Ct. 2050, 32 L. Ed. 2d 334 (1972); see also *Kyllo* v. *United States*, 533 U.S. 27, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001). The rationale for imposing this limitation on the power of officers to make warrantless seizures of items they find in plain view while lawfully performing their duties is to protect the privacy interests of persons who, by exposing themselves or their property to observation by others in what they reasonably believe to be a limited manner, cannot reasonably be found to have surrendered their right not to have such items viewed more extensively or intensively than they reasonably expected when so exposing them by the unexpected use of such uncommon vision-enhancing devices or equipment. Even with this adjustment in meaning, however, it is clear that the perspective from which it must be determined if an item was "in plain view" at the time the officer came upon it is that of the officer himself, who must have viewed it without moving or manipulating it or using uncommon vision-enhancing equipment to examine it before seizing it.

Thirdly, we find that this interpretation of the statute is confirmed, by necessary implication, by the nature of the conduct that is made punishable thereunder. Voyeurism, as the trial court aptly described it in light of its standard dictionary definition, is the practice of obtaining sexual gratification by looking at sexual objects or acts, especially secretively. Voyeuristic behavior thus inherently involves the surreptitious invasion of another person's privacy, usually by secretly viewing the other person while she is engaged in sexual or other intimate behavior. Although the term "voyeurism" is not specially defined in the video voyeurism statute apart from the listing of the elements of the offense so denominated, its use in the statute gives meaning to those elements as the ultimate facts that must be proved to obtain a conviction for that offense.

Consistent with its name, the offense of voyeurism requires proof of conduct that involves or constitutes an aggravated form of voyeurism. The conduct proscribed by the statute is voyeuristic because it involves not only the secret recording of the complainant's image without her knowledge and consent, but the making of that recording under circumstances involving or constituting an invasion of her privacy by recording images of parts or aspects of her person which she has made reasonable efforts not to expose to public view. Such voyeuristic conduct is aggravated both because it preserves the image so recorded in storable, publishable and/or transferable form, exposing the complainant to possible future victimization by repeated viewings of her recorded image by the defendant and others, and because the defendant made that recording either with malice, in violation of subsection (a) (1) of § 53a-189a, or for the purpose of arousing or gratifying the defendant's or another person's sexual desire, in violation of subsection (a) (2) of § 53a-189a. Although only subsection (a) (2) expressly prohibits conduct that falls within the classic definition of voyeurism, because it alone requires proof that the defendant engaged in the prohibited conduct for the purpose of arousing his or another person's sexual desire, both subdivisions (1) and (2) criminalize behavior which, in light of the circumstances under which it must be engaged in, involves or constitutes the surreptitious invasion of the complainant's privacy.

Understood in this light, the "not in plain view" element of voyeurism must logically be construed, like the other two circumstances elements of that offense, as a requirement designed to restrict the scope of liability under the statute to inherently voyeuristic behavior involving or constituting the surreptitious invasion of the complainant's privacy. That interpretation makes sense only if the perspective from which the plain view of the complainant must be evaluated is that of the defendant, as the alleged voyeur. Although, to reiterate, we need not here determine if liability for voyeurism can ever be established without proving that the defendant's opportunity to view the complainant, while surreptitiously recording her image, was reasonably evident to her, establishing that the complainant was *not* in the defendant's plain view when he recorded her image tends to confirm that his act of recording her image, without her knowledge and consent, was performed secretly, and thus voyeuristically. If, by contrast, the defendant recorded the complainant's image while she was *in* his plain view, then she would have been far more likely to see him as he did so, making his act of *viewing* her while he recorded her image nonsecretive and nonvoyeuristic, even though his unconsented-to act of *recording* of what he then viewed of her was not.

Fourth and finally, we agree with the defendant that his interpretation of the "not in plain view" element of

the statute is supported by the use of the phrase "not in plain view" in the "Peeping Tom" subsection of the disorderly conduct statute. By using such language to define an essential circumstances element of another statute of comparable vintage that prohibits a similar kind of voyeuristic behavior, the legislature clearly signaled its intention that under both statutes, the perspective from which it must be determined if the complainant was "in plain view" at the time the defendant engaged in such behavior toward her is that of the defendant, as the alleged voyeur.

In sum, we agree with the trial court's determination that, under the plain and unambiguous language of the video voyeurism statute, the perspective from which the "not in plain view" element of voyeurism must be evaluated is that of the defendant, not that of the general public.

## II

In light of the foregoing analysis, we have no need to consider the legislative history of the statute, much less to determine if, in light of that history, there might be other reasonable interpretations of the legislature's intent as to the meaning of the "not in plain view" element that were not expressed in the plain and unambiguous language of the statute. For that same reason, we have no occasion to decide, even if evidence supporting such an alternative construction of the disputed element could be found, whether the existence of such a construction renders the statute void for vagueness, and thus unenforceable, or requires the application of the rule of lenity. The words of the statute control, and that ends our inquiry.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Although the crime defined in the statute is denominated "voyeurism," the statute itself is known colloquially as the "video voyeurism statute."

[2] The state and the defendant further stipulated that the unconsented-to photographs of the other two complainants showed them in a state of undress when they were in the defendant's immediate physical presence.

[3] Although the state initially objected to the defendant's motion to dismiss under Practice Book § 41-9, on the ground that the defendant had been arrested on a warrant, it ultimately agreed to proceed with the defendant's motion and has not renewed its initial objection on appeal.

[4] Practice Book § 41-8 provides in relevant part: "The following defenses or objections, if capable of determination without a trial of the general issue, shall, if made prior to trial, be raised by a motion to dismiss the information . . . (2) Defects in the information including failure to charge an offense . . . ."