NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240991-U

NO. 4-24-0991

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 26, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Hancock County |
| ROBERT W. HOSKINS, | ) | No. 22CF71 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Rodney G. Clark, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Presiding Justice Harris concurred in the judgment.
Justice Doherty specially concurred.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed in part the judgment of the trial court because (1) defense counsel did not render ineffective assistance of counsel by failing to argue at the motion to suppress hearing that a free-air sniff by a drug detection dog constitutes a search that must be supported by probable cause and (2) the search of defendant's car was supported by probable cause. The appellate court vacated in part the judgment of the trial court and remanded with directions to order a complete waiver of assessments because defense counsel provided ineffective assistance of counsel by failing to file a certification for waiver of assessments.

¶ 2    In June 2022, the State charged defendant, Robert W. Hoskins, by information

with possession of methamphetamine, a Class 2 felony (720 ILCS 646/60(b)(2) (West 2022)). In

August 2023, the trial court denied defendant's motion to suppress evidence. In July 2024, the

court conducted a stipulated bench trial, at the conclusion of which it sentenced defendant to 24

months of probation, pursuant to the joint recommendation of the parties.

¶ 3 Defendant appeals, arguing (1) he received ineffective assistance when his trial counsel failed to argue as part of his motion to suppress evidence that the free-air sniff by a drug detection dog constituted an unlawful search because the dog was trained to detect, among other drugs, cannabis, which was legal to possess in certain amounts, (2) the trial court erred by finding that the dog's positive alert gave the police officers probable cause to search defendant's truck, and (3) he received ineffective assistance when his trial counsel failed to file a certificate for a waiver of assessments. We disagree with defendant's first and second arguments but agree with his third argument. Accordingly, we affirm in part and vacate in part the judgment of the trial court and remand for the trial court to order a full waiver of assessments.

¶ 4                                    I. BACKGROUND

¶ 5                        A. The Charges and Pretrial Proceedings

¶ 6 In June 2022, the State charged defendant by information with possession of more than 5 grams but less than 15 grams of methamphetamine, a Class 2 felony (*id.*).

¶ 7 In August 2023, defendant filed a motion to suppress evidence, arguing that the search of his truck following a positive alert by a drug detection dog was unlawful because it was not supported by probable cause. Specifically, defendant asserted that "[cannabis] is a legal substance in Illinois and should not be classified as contraband for a canine to alert to a vehicle and allow law enforcement access inside the vehicle." Defendant asserted that, before conducting the free-air sniff with the drug detection dog, the sheriff's deputies had observed "no corroborating factors *** to indicate that the truck contained contraband or evidence of criminal activity," such as smelling or observing any cannabis or other contraband in the truck.

¶ 8                        B. The Motion To Suppress Hearing

¶ 9 In October 2023, the trial court conducted a hearing on defendant's motion to

suppress, at which defendant called Sergeant Ryan Dykstra and Deputy Rhea Flambeau of the Hancock County Sheriff's Office to testify.

¶ 10                                    1. *Sergeant Ryan Dykstra*

¶ 11          Sergeant Ryan Dykstra testified that on June 3, 2022, he was on duty in Hamilton, Illinois, when a state police investigator who had been conducting surveillance on a local bar "called out a [pickup truck] that had suspicious activity that was leaving the bar." Dykstra pulled the truck over after observing that it did not have an illuminated rear registration light. He identified defendant as the driver and testified that there was a passenger in the back seat. Deputy Flambeau arrived as Dykstra was requesting defendant's driver's license.

¶ 12          Dykstra testified that he did not smell the odor of any cannabis or observe any "paraphernalia" in the truck when he was speaking with defendant through the driver's side window. Defendant provided his driver's license to Dykstra, but not his insurance information. He did not show any signs of nervousness.

¶ 13          Dykstra asked Flambeau to conduct a free-air sniff with his drug detection dog, Mack. Flambeau informed Dykstra that Mack made a positive alert. Dykstra and Flambeau then searched the truck and both occupants. They found (1) a bag containing suspected methamphetamine under the driver's seat and (2) "paraphernalia" in the passenger's possession.

¶ 14          Defendant then played video footage of the traffic stop.

¶ 15          On cross-examination, Dykstra further testified that the "suspicious activity" relayed by the state police investigator related to drug activity—namely, that the truck's passenger was "going back and forth inside of [the bar] to the vehicle, like, two or three times; something like that." The prosecutor asked Dykstra why he requested the free-air sniff, and he answered (1) the "drug intel" and (2) the passenger acting "very suspiciously" in the back seat by

"breathing heavily and *** lean[ing] over." Dykstra testified that, without the sniff, (1) he did not believe he had probable cause to search the truck and (2) he believed the results of the sniff would contribute to his ability to access the vehicle.

¶ 16                                    2. *Deputy Rhea Flambeau*

¶ 17         Rhea Flambeau, a K-9 deputy with the Hancock County Sheriff's Office, testified that on the night of the traffic stop, a "small [law enforcement] detail" was conducting surveillance in Hamilton. When he learned that Dykstra located and followed the truck that the state police investigator had identified over the radio, Flambeau went in that direction "to be ready in case they needed [him] for the K-9."

¶ 18         When Flambeau arrived, Dykstra had the truck stopped and asked Flambeau to conduct a free-air sniff. Mack gave a positive alert on the passenger door. Flambeau testified that Mack was trained to detect the odor of cannabis, methamphetamine, heroin, and cocaine.

¶ 19         After Mack alerted to the vehicle, Dykstra asked the passenger to exit the truck, and Flambeau searched him. Flambeau also searched the truck and found a baggie containing a "fairly large chunky white crystal substance" under the driver's seat. (We note that, at the subsequent stipulated bench trial, the parties stipulated that (1) the substance field tested positive for methamphetamine and (2) a forensic scientist later conducted a chemical analysis of the substance and determined it to be 12.7 grams of methamphetamine, and at the preliminary hearing, Dykstra testified that "some cannabis," was found.)

¶ 20                                    3. *The Trial Court's Ruling*

¶ 21         After Flambeau's testimony, the State moved for a directed finding, arguing that defendant had not met his burden to show that the search of his vehicle was unlawful because, "given the current state of the law in the Fourth District," a K-9 sniff was "appropriate despite

[the K-9] being imprinted on cannabis."

¶ 22    The trial court agreed with the State and denied defendant's motion to suppress, noting that in *People v. Mallery*, 2023 IL App (4th) 220528, the Fourth District "recently found a positive alert by a K-9 certified and trained to detect five narcotic substances, including cannabis, was sufficient to establish probable cause."

¶ 23                    C. The Stipulated Bench Trial and Sentence

¶ 24    In July 2024, the trial court conducted defendant's bench trial, at which the parties submitted only a written joint stipulation of facts for the court's consideration. The court found defendant guilty. Immediately afterward, the parties jointly recommended a sentence of 24 months of probation, and the court imposed the agreed-upon 24 months' probation.

¶ 25    This appeal followed.

¶ 26                    II. ANALYSIS

¶ 27    Defendant appeals, arguing (1) he received ineffective assistance when his trial counsel failed to argue that the free-air sniff by the K-9 constituted an unlawful search because Mack was trained to detect cannabis, which was legal to possess in certain amounts, (2) the trial court erred by finding that Mack's positive alert gave the police officers probable cause to search defendant's truck, and (3) he received ineffective assistance when his trial counsel failed to file a certificate for a waiver of assessments. We disagree with defendant's first and second arguments but agree with his third argument. Accordingly, we affirm in part and vacate in part the judgment of the trial court and remand for the trial court to order a full waiver of assessments.

¶ 28                    A. The Search of Defendant's Truck Was Lawful

¶ 29    Defendant argues that his trial counsel rendered ineffective assistance by failing to argue that the methamphetamine should have been suppressed because Mack's free-air sniff

constituted a search within the meaning of the fourth amendment (U.S. Const., amend. IV) and Dykstra's testimony showed that he did not have probable cause to search defendant's truck without Mack's positive alert. Specifically, defendant argues that Mack's training to detect narcotics, including cannabis, in light of changes in the law regarding the legalization of the possession of a small amount of cannabis transformed the free-air sniff into a search because Mack could detect legal as well as illegal activity. Defendant asserts that he received ineffective assistance of counsel because had his attorney made the foregoing argument at the motion to suppress hearing, the methamphetamine would have been suppressed.

¶ 30         We disagree.

¶ 31                                   1. *The Applicable Law*

¶ 32                                   a. Ineffective Assistance of Counsel

¶ 33         "To demonstrate ineffective assistance of counsel, a defendant must show that (1) the attorney's performance fell below an objective standard of reasonableness and (2) the attorney's deficient performance prejudiced the defendant in that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *People v. Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

¶ 34         "In evaluating an attorney's performance for purposes of an ineffective assistance of counsel claim, that performance must be evaluated from counsel's perspective at the time the contested action was taken." *People v. Webb*, 2023 IL 128957, ¶ 22. "An attorney will not be deemed deficient for failing to make an argument that has no basis in law." *Id.*

¶ 35         "To establish prejudice when an ineffective assistance claim is based on trial counsel's failure to file a suppression motion, a defendant must demonstrate that the unargued

suppression motion was meritorious and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *Id.* ¶ 23.

¶ 36 Claims of ineffective assistance of counsel are reviewed *de novo*. *Id.*

¶ 37 b. Warrantless Vehicle Searches

¶ 38 The United States and Illinois Constitutions prohibit unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. 1, § 6. "Generally, a search is *per se* unreasonable if conducted without a warrant supported by probable cause and approved by a judge or magistrate." *People v. Hill*, 2020 IL 124595, ¶ 20. However, because an automobile is easily moved, "render[ing] it impracticable to secure a warrant before the automobile escapes the jurisdiction in which the warrant must be sought," a warrantless search of an automobile is not *per se* unreasonable. *Id.* ¶ 21.

¶ 39 Nonetheless, a warrantless search of an automobile must still be supported by probable cause. *Id.* ¶ 22. "To establish probable cause, it must be shown that the totality of the facts and circumstances known to the officer at the time of the search would justify a reasonable person in believing that the automobile contains contraband or evidence of criminal activity." *Id.* ¶ 23. "In determining whether probable cause to conduct a warrantless search of an automobile exists, an officer may rely on his law-enforcement training and experience to make inferences that might evade an untrained civilian." *Webb*, 2023 IL 128957, ¶ 25 (citing *Hill*, 2020 IL 124595, ¶ 23).

¶ 40 The Illinois Supreme Court "has long held that the use of drug-sniffing dogs to detect the presence of narcotics is an acceptable method to establish probable cause." *Id.* ¶ 15 (citing *People v. Campbell*, 67 Ill. 2d 308, 315-16 (1977)); see *People v. Mallery*, 2023 IL App (4th) 220528, ¶ 22 (collecting cases). Moreover, although a vehicle stop on a highway constitutes

a seizure within the meaning of the fourth amendment, "[t]he fact that officers walk a narcotics-detection dog around the exterior of [the] car *** does not transform the seizure into a search." *City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000) (citing *United States v. Place*, 462 U.S. 696, 707 (1983)). "[A]n exterior sniff of an automobile does not require entry into the car and is not designed to disclose any information other than the presence or absence of narcotics." *Id.* "[A] sniff by a dog that simply walks around a car is much less intrusive than a typical search." (Internal quotation marks omitted.) *Id.*

¶ 41                                            c. Cannabis Laws in Illinois

¶ 42            Section 4 of the Cannabis Control Act (Control Act) (720 ILCS 550/4 (West 2022)) provides that, "[e]xcept as otherwise provided in the Cannabis Regulation and Tax Act [(Regulation Act) 410 ILCS 705/1-1 *et seq.* (West 2022)] and the Industrial Hemp Act [(505 ILCS 89/1 *et seq.* (West 2022))], it is unlawful for any person to knowingly possess cannabis." The Regulation Act, however, which became effective January 1, 2020, "in laymen's terms [provides] that it is legal for an Illinois citizen who is over the age of 21 to use or possess up to 30 grams of cannabis." *People v. Molina*, 2024 IL 129237, ¶ 40 (construing section 10-5 of the Regulation Act (410 ILCS 705/10-5 (West 2020))). Section 10-35 of the Regulation Act provides two exceptions to the general proposition that it is legal for an Illinois citizen over 21 years old to possess up to 30 grams of cannabis. First, section 10-35 prohibits a person from possessing cannabis in a vehicle "unless the cannabis is in a reasonably secured, sealed or resealable container and reasonably inaccessible while the vehicle is moving." 410 ILCS 705/10-35(a)(2)(D) (West 2022). Section 10-35 also states that the Regulation Act "does not permit any person to engage in, and does not prevent the imposition of any civil, criminal, or

other penalties for *** (3) using cannabis *** (D) in any motor vehicle *** [or] (F) in any public place." *Id.* § 10-35(a)(3)(D), (F).

¶ 43 Additionally, "within the same public act that created the Regulation Act, the legislature amended the [Illinois] Vehicle Code to prohibit the possession of cannabis in a motor vehicle unless it is stored in a 'sealed, odor-proof, child-resistant cannabis container." *Molina*, 2024 IL 129237, ¶ 45 (citing 625 ILCS 5/11-502.15(b), (c) (West 2020)). The supreme court has construed this provision of the Vehicle Code to add an " 'additional requirement' beyond the possession requirements in the Regulation Act: namely, that the cannabis be stored in an odor-proof container." *Id.*

¶ 44 Moreover, it remains illegal to drive or be in actual physical control of a vehicle if, among other things, a person (1) is "under the influence of any other drug or combination of drugs to a degree that renders the person incapable of safely driving" or (2) "has, within 2 hours of driving or being in actual physical control of a vehicle, a tetrahydrocannabinol concentration in the person's whole blood or other bodily substance." 625 ILCS 5/11-501(a)(4), (7) (West 2022).

¶ 45                                  2. *This Case*

¶ 46 In the present case, defendant frames the issue as "whether a police canine's open-air sniff constitutes a search." He cites as authority for his position the decisions of the United States Supreme Court in *Kyllo v. United States*, 533 U.S. 27, 40 (2001), and *Illinois v. Caballes*, 543 U.S. 405, 410 (2005). Indeed, defendant argues that his position in this case—that an open-air sniff constitutes a search because in Illinois a citizen over the age of 21 may legally possess up to 30 grams of cannabis and therefore a drug detection dog may be detecting lawful activity—is a "logical corollary" of the holdings in those two cases. We disagree.

¶ 47                                    a. *Kyllo v. United States*

¶ 48            In *Kyllo v. United States*, 533 U.S. 27, 29-30 (2001), law enforcement officers

who suspected that the defendant was growing cannabis in his home used a thermal imaging

device to scan the defendant's home to determine whether an amount of heat emanating from the

home was consistent with the use of the high-intensity lamps typically required to grow cannabis

indoors The scan took only a few minutes and was performed from the law enforcement officer's

vehicle from the street outside the home. *Id.* at 30. "The scan showed that the roof over the

garage and a side wall *** were relatively hot compared to the rest of the home and substantially

warmer than the neighboring homes." *Id.* Based upon this information, informant tips, and utility

bills, the law enforcement officers obtained a search warrant for the defendant's home and, upon

the execution of the warrant, found a cannabis growing operation. *Id.*

¶ 49            The United States Supreme Court addressed whether the officers' use of the

thermal imaging gun constituted a search within the meaning of the fourth amendment. *Id.* at

31-32. The Court first observed that visual surveillance of a home remained lawful, noting that

" '[t]he Fourth Amendment protection of the home has never been extended to require law

enforcement officers to shield their eyes when passing by a home on public thoroughfares.' " *Id.*

at 32 (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)).

¶ 50            The Court then referred to its holding in *Katz v. United States*, 389 U.S. 347

(1967), in which it concluded that warrantless "eavesdropping by means of an electronic

listening device placed on the outside of a telephone booth" constituted an unreasonable search

under the fourth amendment because "a Fourth Amendment search occurs when the government

violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo*, 533

U.S. at 32-33. In *Katz*, the defendant " 'justifiably relied' upon the privacy of the telephone

booth." *Id.* at 33. The Supreme Court in *Kyllo* observed that it had subsequently applied this principle from *Katz* "to hold that a Fourth Amendment search does *not* occur—even when the explicitly protected location of a *house* is concerned—unless [(1)] 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and [(2)] 'society [is] willing to recognize that expectation as reasonable.' " (Emphases in original.) *Id.* at 33 (quoting *Ciraolo*, 476 U.S. at 211).

¶ 51        Applying these principles from *Katz*, the *Kyllo* court concluded that the warrantless use of the thermal imaging gun to scan the outside of the defendant's home constituted a search. *Id.* at 34-35. The Court reasoned as follows:

> "While it may be difficult to refine *Katz* when the search of areas such as telephone booths, automobiles, or even the curtilage and uncovered portions of residences is at issue, in the case of the search of the interior of homes—the prototypical and hence most commonly litigated area of protected privacy—there is a ready criterion, with roots deep in the common law, of the minimal expectation of privacy that *exists*, and that is acknowledged to be *reasonable*. To withdraw protection of this minimum expectation of privacy would be to permit police technology to erode the privacy guaranteed by the Fourth Amendment. We think that obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical 'intrusion into a constitutionally protected area' [citation] constitutes a search—at least where (as here) the technology in question is not in general public use." (Emphases in original.) *Id.* at 34.

¶ 52        The Court rejected the government's argument that the thermal imaging was

constitutional because it did not detect private activities occurring in private areas, noting that "[i]n the home, *** *all* details are intimate details, because the entire area is held safe from prying government eyes." (Emphasis in original.) *Id.* at 37. The Court famously surmised that the thermal imaging gun "might disclose, for example, at what hour each night the lady of the house takes her daily sauna and bath—a detail that many would consider 'intimate.' " *Id.* at 38. The Court concluded as follows:

> "We have said that the Fourth Amendment draws 'a firm line at the entrance to the house,' [citation]. That line, we think, must be not only firm but also bright ***. ***
>
> Where, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." *Id.* at 40.

¶ 53                              b. *Illinois v. Caballes*

¶ 54        Approximately three and a half years later, in *Caballes*, 543 U.S. at 407, the Supreme Court had the opportunity to apply its fourth amendment precedent to the question of whether a canine sniff of an automobile by a drug detection dog constituted a search. In that case, an Illinois state trooper stopped the defendant for speeding. *Id.* at 406. While writing the defendant a warning ticket, a member of the Illinois State Police Drug Interdiction Team walked his narcotics-detection dog around the defendant's car, and the dog alerted at the trunk. *Id.* Based on that alert, the officers searched the trunk and found cannabis. *Id.*

¶ 55        The Court concluded that the dog sniff did not infringe upon the defendant's "constitutionally protected interest in privacy." *Id.* at 408. The Court reasoned as follows:

"Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment. [United States v. *Jacobsen*, 466 U.S.107, 123 (1984).] We have held that any interest in possessing contraband cannot be deemed 'legitimate,' and thus, governmental conduct that *only* reveals the possession of contraband 'compromises no legitimate privacy interest.' *Ibid.* This is because the expectation 'that certain facts will not come to the attention of the authorities' is not the same as an interest in 'privacy that society is prepared to consider reasonable.' *Id.*, at 122 ***. In *United States v. Place*, 462 U.S. 696 *** (1983), we treated a canine sniff by a well-trained narcotics-detection dog as '*sui generis*' because it 'discloses only the presence or absence of narcotics, a contraband item.' ***

Accordingly, the use of a well-trained narcotics-detection dog—one that 'does not expose noncontraband items that otherwise would remain hidden from public view,' *Place*, 462 U.S at 707 ***—during a lawful traffic stop, generally does not implicate legitimate privacy interests. In this case, the dog sniff was performed on the exterior of [the defendant's] car while he was lawfully seized for a traffic violation. Any intrusion on [the defendant's] privacy expectations does not rise to the level of a constitutionally cognizable infringement." (Emphasis in original) *Id.* at 409.

¶ 56     The Court then addressed *Kyllo* and wrote the following:

"This conclusion is entirely consistent with our recent decision that the use of a thermal-imaging device to detect the growth of marijuana in a home constituted an unlawful search. [Citation.]. Critical to that decision was the fact

that the device was capable of detecting lawful activity—in that case, intimate details in a home, such as 'at what hour each night the lady of the house takes her daily sauna and bath.' [Citation.] The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from [the defendant's] hopes or expectations concerning the nondetection of contraband in the trunk of his car. A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Id.* at 409-10.

¶ 57       We note that subsequently, in *People v. Caballes*, 221 Ill. 2d 282, 316-17 (2006), the Illinois Supreme Court determined that the privacy clause of the Illinois Constitution (Ill. Const. 1970, art. 1, § 6) did not provide greater protection than the fourth amendment. The court held, like the United States Supreme Court, that "the dog sniff of a vehicle does not constitute an invasion of privacy." *Caballes*, 221 Ill. 2d at 331. The court explained that a dog sniff of an individual or his vehicle or luggage does not reveal "private medical information," "the contents of diaries or love letters," "the individual's choice of reading materials, whether religious, political, or pornographic," "sexual orientation or marital infidelity." *Id.* at 330-31. The court continued:

"Thus, [a warrantless dog sniff of a vehicle lawfully stopped] does not infringe on the zone of personal privacy that the drafters intended to protect. Properly conducted, a dog sniff will not result in the slightest touching of the individual ***.

Indeed, once the dog sniff has been conducted, no search will ensue unless

the dog alerts to the scent of illegal narcotics. \*\*\*

> We conclude that the dog sniff of a vehicle does not constitute an invasion of privacy. It is, in fact, even less invasive or intrusive than the routine pat down which, after all, involves the officer's physical contact with the clothing of the individual. \*\*\* Given our limited lockstep approach to search and seizure analysis, the answer is clear. The sniff did not violate defendant's right to be free from unreasonable search and seizure." *Id.* at 331-32 (citing *Caballes*, 543 U.S. at 409).

¶ 58                                         c. Defendant's Argument

¶ 59        Having set forth the holdings and reasoning of *Kyllo* and *Caballes*, we now turn to defendant's argument that the logic of *Kyllo* and *Caballes* requires the conclusion that a warrantless sniff by a drug detection dog that is trained to alert to the presence of cannabis as well as illegal narcotics during a lawful traffic stop now constitutes a search that must be supported by probable cause because the dog might be alerting to a person's lawful possession of cannabis.

¶ 60        Defendant's argument is unpersuasive. First, we note that *Kyllo*, by itself, has little application to the present case. *Kyllo* held that the use of a thermal imaging device to scan a home constitutes an unreasonable invasion of privacy. *Kyllo*, 533 U.S at 34-35. Glaringly distinct from the present case is the fact that *Kyllo* involved the government's ability to obtain details from *inside a home*. Indeed, the *Kyllo* holding rested primarily on the Supreme Court's concern with preserving the sanctity and privacy of the interior of the *home*. *Id.* at 34, 37. Additionally, *Kyllo* signaled that the *Katz* "reasonable expectation of privacy" test might yield a different result for another location, such as an automobile. *Id.* at 34.

¶ 61 And the Supreme Court later concluded exactly that in *Caballes* when it determined that a free-air sniff by a drug detection dog of a vehicle during a lawful traffic stop did *not* constitute a search under the fourth amendment. *Caballes*, 543 U.S. at 408. The *Caballes* court mentioned *Kyllo* only to (1) note that its holding in *Caballes* was consistent with its decision in *Kyllo* and then (2) distinguish *Kyllo* by explaining that, although *Kyllo*'s primary concern was the government's ability to detect lawful activity within the home, a dog sniff "reveals no information other than the location of a substance that no individual has any right to possess." *Id.* at 405. Put another way, *Caballes* pointed out that *Kyllo* dealt with the detection of lawful activity inside of the home, whereas *Caballes* dealt with the detection of unlawful activity inside a vehicle. The present case deals with neither the detection of (1) lawful activity within the home (*Kyllo*) nor (2) always unlawful activity inside a vehicle (*Caballes*). Instead, this case concerns the detection of always unlawful *and* sometimes unlawful—but sometimes lawful— activity within a vehicle. Neither *Caballes* nor *Kyllo* contemplated this third category and are thus distinguishable. We discuss defendant's reliance on each of these cases in turn.

¶ 62 In *Caballes*, the Supreme Court concluded that the canine sniff was not a search because (1) drug detection dogs are trained to detect illegal narcotics and (2) a person does not have a privacy interest in the possession of a substance that the law does not allow them to possess. In 2005, when *Caballes* was decided, there was no legal way for a person to possess cannabis. In 2022, the time of the present offense, citizens could legally possess a small amount of cannabis under certain conditions. *Molina*, 2024 IL 129237, ¶ 40; 410 ILCS 705/10-5 (West 2022); 625 ILCS 5/11-502.15(b), (c) (West 2022). Based on this change in the law, defendant contends that cannabis falls into the category of "noncontraband items that otherwise would remain hidden from public view," which, when exposed by a dog sniff, implicates a legitimate

privacy interest. See *Caballes*, 542 U.S. at 409 ("[T]he use of a well-trained narcotics-detection dog—one that 'does not expose noncontraband items that otherwise would remain hidden from public view,' [*Place*, 462 U.S. at 707] ***—during a lawful traffic stop, generally does not implicate legitimate privacy interests.").

¶ 63    Defendant asserts that because *Caballes* wrote that the use of a drug detection dog that "does not expose noncontraband items *** generally does not implicate legitimate privacy interests," we must conclude that the opposite is also true—namely, that the use of a drug detection dog that exposes contraband items that are sometimes noncontraband under certain circumstances *does* implicate legitimate privacy interests. But *Caballes* does not support this conclusion; *Caballes* contemplated only a binary situation: contraband and noncontraband (substances illegal to possess and substances legal to possess).

¶ 64    However, the possession of cannabis—this "sometimes contraband, sometimes not contraband" substance—remains *unlawful* in more ways than it has become lawful. As this court observed in *People v. Molina*, 2022 IL App (4th) 220152, ¶ 41, "Just because [the] defendant can legally possess some amounts of cannabis under specified conditions does not mean that all forms of possession are presumed to be legal." And, "[r]egardless of recent changes in the law legalizing possession of small amounts of cannabis, there are still, among other things (1) illegal ways to transport it, (2) illegal places to consume it, and (3) illegal amounts of it to possess." *Id.* ¶ 43. Although Illinois law permits an Illinois citizen over 21 to possess up to 30 grams of cannabis, if the cannabis is being transported in a vehicle, it must be stored in an odor-proof container (410 ILCS 705/10-35(a)(2)(D) (West 2022); 625 ILCS 5/11-502.15(b)(c) (West 2022)), and a person may not use cannabis in a vehicle (410 ILCS 705/10-35(a)(3)(D), (F) (West 2022)).

¶ 65　　　　　We reject as overly broad defendant's assertion throughout his brief and foundational to his argument that the possession of less than 30 grams of cannabis is perfectly legal. In Illinois, it is lawful for a person to possess cannabis in a vehicle *only* if (1) the person is an Illinois citizen, (2) the person is over 21 years old, (3) the person possesses no more than 30 grams, (4) the person is not using the cannabis, *and* (5) the cannabis is stored in an odor-proof container. If all the foregoing criteria are not met, the person is not lawfully possessing the cannabis. Accordingly, the lawful possession of cannabis in a vehicle in Illinois remains tightly controlled and regulated and is a narrow carve-out from the starting premise that "it is unlawful for any person to knowingly possess cannabis" (720 ILCS 550/4 (West 2022)). Because *Caballes* did not contemplate the complicated legal status of cannabis that we face in this case, it simply does not control the outcome of our decision, either through its holding or logical inferences defendant would like us to draw from its holding.

¶ 66　　　　　Which leaves us with *Kyllo*. We have already stated that *Kyllo* has little application to this case because its focus was primarily on the sanctity of the interior of the home—a fact not present here and which *Kyllo* itself stated was material to the application of the *Katz* "expectation of privacy" test. *Kyllo*, 533 U.S. at 33. Another way in which *Kyllo* is distinguishable is that it was primarily concerned with the detection of always lawful activity within the home, evidenced by the court's given examples of details the thermal image could detect as (1) the hour at which the residents used the bath or sauna or (2) whether the resident left the closet light on. *Id.* at 39. The present case, as we have pointed out, deals with the detection of activity that is primarily unlawful, but sometimes lawful under strict circumstances. Not only does this factual context further distinguish *Kyllo*, it also demonstrates another way in which the present case deals with a significantly lesser expectation of privacy than *Kyllo*.

¶ 67        The *Kyllo* court, citing its own precedent in *Katz*, stated that "a Fourth Amendment search occurs when the government violates a [(1)] subjective expectation of privacy that [(2)] society recognizes as reasonable." *Id.* at 33. The Court then immediately reiterated the *Katz* test, citing its decision in *Ciraolo* to state the same principle from the opposite perspective: "[A] Fourth Amendment search does *not* occur—even when the explicitly protected location of a *house* is concerned—unless '[(1)] the individual manifested a subjective expectation of privacy in the object of the challenged search,' and '[(2)] society [is] willing to recognize that expectation as reasonable.' " (Emphases in original.) *Id.* (quoting *Ciraolo*, 476 U.S. at 211). Put another way, the Fourth Amendment protects against an *unreasonable* intrusion upon a legitimate privacy interest. See *Oliver v. United States*, 466 U.S. 170, 177 (1984) ("The [Fourth] Amendment does not protect the merely subjective expectation of privacy, but only those expectation[s] that society is prepared to recognize as 'reasonable.' " (Internal quotations omitted.)); See also *Ciraolo*, 476 U.S. at 212 (explaining that, when determining whether an expectation of privacy is reasonable, "we must keep in mind that the test of legitimacy is not whether the individual chooses to conceal assertedly private activity, but instead whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." (Internal quotation marks omitted.)).

¶ 68        Applying that principle to the facts in the present case—a free-air sniff of a vehicle during a lawful traffic stop by a dog trained to detect the odor of cocaine, methamphetamine, heroin, and cannabis—it is clear that any expectation of privacy is vastly diminished from that expressed in *Kyllo* because (1) the location of the search is a vehicle in public subject to a lawful traffic stop, not the interior of a home, and (2) the object of the search may be cannabis, which remains (i) primarily illegal to possess, (ii) highly regulated, and

(iii) legal to possess in a vehicle only under narrow circumstances prescribed by statute. And, the other drugs besides the cannabis that Mack was trained to detect—methamphetamine, heroin, and cocaine—continue to be unlawful to possess in whatever quantity in a car or anywhere else.

¶ 69       Moreover, although society's attitudes about cannabis have clearly shifted and continue to do so, they have not shifted so far to lead us to conclude that society would recognize as reasonable an expectation of privacy in the transport of cannabis in a vehicle that would preclude the use of drug detection dogs to detect the presence of other illegal narcotics, such as heroin, cocaine, or methamphetamine, or the illegal possession or transportation of cannabis.

¶ 70       On that point, we note that the Illinois Supreme Court in *Caballes*, 221 Ill. 2d at 316, recognized a balance that must be achieved between an individual's legitimate privacy interest and the public's interest in effective law enforcement when it wrote the following:

"Despite [the] defendant's arguments that the people of the State of Illinois will be best served by an expansive reading of the search and seizure clause of our constitution ***, we note that the people of this state have a stake in both sides of this debate. Indeed, this prosecution was brought in the name of the People of the State of Illinois, who are well served when law enforcement officers are able to detect the presence of illegal narcotics and to arrest those who violate the law. The people are also well served when law enforcement officers and other state actors are constrained from intruding upon the privacy of individuals.

We conclude that the search and seizure clause of article I, section 6, of the state constitution, as construed under our limited lockstep approach, strikes the proper balance between protecting the people from unreasonable intrusion by the state and providing the people with effective law enforcement."

To accept defendant's position in this case would disrupt that balance by impairing the ability of law enforcement officers to effectively enforce the remainder of the cannabis laws in this state—those that prohibit the possession, transportation, and trafficking of more than 30 grams of cannabis—to the detriment of the people.

¶ 71 We reiterate that when litigating a motion to suppress evidence, it is the defendant's burden to demonstrate that an unlawful search occurred. See *People v. Brooks*, 2017 IL 121413, ¶ 22 ("When a defendant files a motion to suppress evidence, he bears the burden of proof at a hearing on that motion. *** Where the basis for the motion is an allegedly illegal search, the defendant must establish both that there was a search and that it was illegal.") Here, defendant has offered the holdings and reasoning of *Kyllo* and *Caballes* to support his argument that an unlawful search occurred. For the reasons we have explained, we conclude that neither *Kyllo* nor *Caballes*—individually or jointly—comes close to making that showing. Accordingly, we conclude that defendant failed to meet his burden to establish that an unlawful search occurred in this case. As a result, defendant has also failed to establish that he received ineffective assistance of counsel by failing to argue that the sniff was a search. See *People v. Rogers*, 2021 IL 126163, ¶ 32 ("Counsel cannot be considered ineffective for failing to make or pursue what would have been a meritless motion or objection.").

¶ 72 Moreover, at the time defense counsel filed the motion to suppress in this case, (1) supreme court precedent held that "the use of dogs trained in the detection of narcotics [was] a permissible method of establishing probable cause" (*Webb*, 2023 IL 128957, ¶ 26 (citing *Campbell*, 67 Ill. 2d at 315-16)) and (2) Fourth District appellate court precedent held that a positive alert on a vehicle by a drug detection dog provides probable cause for a search (*Mallery*, 2023 IL App 4th) 220528, ¶ 49). Trial and appellate courts "are bound to apply *** precedent to

- 21 -

the facts of the case before them. (Internal quotation marks omitted.) *Webb*, 2023 IL 128957, ¶34. Accordingly, had defense counsel argued during the motion to suppress hearing that the sniff itself was a search requiring probable cause, the trial court would have been bound to deny that motion because applicable precedent held that Dykstra's use of Mack to develop probable cause was proper. See *Webb*, 2023 IL 128957, ¶ 34 ("Had counsel filed a motion to suppress *** on the basis that the canine sniff, without more, did not establish probable cause *** the trial court would have been bound to apply *Campbell* *** and would have denied that motion.") "[A]n attorney will not be deemed deficient for failing to make an argument that has no basis in law." *Id.*

¶ 73     Because we have determined that defendant has not demonstrated that the dog sniff itself constituted an unlawful search, we also reject defendant's second argument on appeal—namely, that the trial court erred by finding that Mack's positive alert gave the police officers probable cause to search defendant's truck. As we have discussed, this court's clear precedent in *Mallery*, 2023 IL App (4th) 220528, ¶ 49, holds that a positive alert by a drug detection dog provides probable cause for the search of a vehicle.

¶ 74                                   2. *Waiver of Assessments*

¶ 75     Defendant also argues that his counsel rendered ineffective assistance by failing to file a certificate for waiver of court assessments. We agree.

¶ 76                                   a. The Applicable Law

¶ 77     Section 124A-20(b) of the Code of Criminal Procedure of 1963 provides that a defendant convicted of a criminal offense may apply for a waiver of assessments no later than 30 days after his or her sentencing. 725 ILCS 5/124A-20(b) (West 2022). "Assessments" are defined as "any costs imposed on a criminal defendant under Article 15 of the Criminal and

Traffic Assessment Act [(705 ILCS 135/art. XV (West 2022))], but does not include violations of the Illinois Vehicle Code assessments." *Id.* § 124A-20(a).

¶ 78 Subsection (b) requires the trial court to grant a full assessment waiver if the court finds the defendant is indigent. *Id.* § 124A-20(b)(1).

¶ 79 For applicants who do not qualify as indigent, the statute requires the court to grant a partial waiver of assessments based upon the applicant's available income relative to the poverty level. Relevant here, subsection (b)(2) states the following:

"The court shall grant the applicant a partial assessment as follows:

(A) 75% of all assessments shall be waived if the applicant's available income is greater than 200% but no more than 250% of the poverty level, unless the applicant's assets that are not exempt under Part 9 or 10 of Article XII of the Code of Civil Procedure [(735 ILCS 5/12-901 through 12-1006 (West 2022))] are such that the applicant is able, without undue hardship, to pay the total assessments." *Id.* § 124A-20(b)(2)(A).

¶ 80 Section 124A-20(c) provides that "[t]he contents of the application for a waiver of assessment, and the procedure for deciding the applications, shall be established by Supreme Court Rule." *Id.* § 124A-20(c).

¶ 81 As a result, the supreme court promulgated Illinois Supreme Court Rule 404 (eff. Sept. 1, 2023). Subsection (e) of Rule 404 applies specifically to "[c]ases involving representation by public defenders" and provides as follows:

"In any case where a defendant is represented by a public defender, *** the attorney representing that defendant shall file a certification with the court, and that defendant shall be entitled to a waiver of assessments as defined in 725 ILCS

5/124A-20(a) without necessity of an Application under this rule. The certification shall be prepared by utilizing, or substantially adopting the appearance and content of, the form provided in the Article IV Forms Appendix." Ill. S. Ct. R. 404(e) (eff. Sept. 1, 2023).

¶ 82 The Article IV Forms Appendix includes both (1) an "Application for Waiver of Court Assessments," which is filled out by the applicant and requires detailed financial information for the trial court to make a determination regarding a complete or partial waiver and (2) a "Certification For Waiver of Court Assessments," which is filled out by the public defender and requires counsel to certify simply that he or she represented the defendant, who is "therefore entitled to a waiver of assessments." Ill. S. Ct. Rs Art. IV Forms Appendix R. 404.

¶ 83 Claims of ineffective assistance are governed by the familiar standard we have set forth above (*supra*, ¶¶ 31-36).

¶ 84 b. This Case

¶ 85 Defendant's counsel was required by Rule 404(e) to file a certification for waiver of assessments within 30 days of defendant's sentence being imposed. Counsel did not meet this obligation and, consequently, defendant filed his own application, which resulted in a partial waiver. Had counsel filed the certification, defendant would have been entitled to a full waiver. Accordingly, we agree with defendant that he was prejudiced in the amount of the additional 25% waiver he did not receive. Accordingly, we vacate the trial court's order for a 75% waiver of assessments and remand with directions for the trial court to order a full waiver of assessments.

¶ 86 III. CONCLUSION

¶ 87 For the reasons stated, the judgment of the trial court is affirmed in part, vacated

in part, and remanded for the trial court to order a full waiver of assessments.

¶ 88        Affirmed in part, vacated in part, and remanded with directions.

¶ 89        JUSTICE DOHERTY, specially concurring:

¶ 90        The United States Supreme Court has held "the use of a well-trained narcotics-detection dog—one that 'does not expose nonconcontraband items that would otherwise remain hidden from public view' [(*Place*, 462 U.S. at 707)]—during a lawful traffic stop, generally does not implicate legitimate privacy interests," so it does not constitute a search under the Fourth Amendment. *Caballes*, 543 U.S. at 409. Because cannabis was formerly illegal, it is understandable that the dog in this case was trained to detect it. But the law has now changed; how does a "dog sniff" that detects a sometimes legal, sometimes illegal substance square with *Caballes*? Is it sufficient, as the majority suggests, that cannabis "remains *unlawful* in more ways than it has become lawful?" *Supra* ¶ 64. Or does the fact that the dog sniff is "*capable* of detecting lawful activity" render it a search? (Emphasis added.) *Caballes,* 543 U.S. at 409.

¶ 91        This Fourth Amendment issue is important because it is entirely new and unaddressed by any relevant Illinois cases. That is, however, exactly the reason I conclude it should not be addressed *in this case*. The issue was not raised below, and it only comes to us via defendant's argument that his attorney rendered ineffective assistance by *failing* to raise it. In other words, defendant's argument is that, even though the issue had no explicit support in existing Illinois case law, his attorney was ineffective for choosing not to raise it.

¶ 92        This stretches the concept of ineffective assistance well beyond its bounds. While an attorney has every right to argue in good faith for the extension or modification of existing law (Ill. R. Prof'l Conduct R. 3.1 (eff. Jan. 1, 2010)), there is no general *obligation* to do so. The

decision whether a novel legal issue might be pursued in a particular case seems to be inherently one of strategy. "Matters of trial strategy are generally immune from claims of ineffective assistance of counsel." *People v. Manning*, 241 Ill. 2d 319, 327 (2011). "Moreover, numerous state and federal courts have concluded that counsel's failure to advance novel legal theories or arguments does not constitute ineffective performance." *Ledbetter v. Commissioner of Correction*, 275 Conn. 451, 461-62, 880 A.2d 160, 167 (Conn. 2005) (collecting cases).

¶ 93 It is true that a court "may dispose of an ineffective assistance of counsel claim by proceeding to the prejudice prong without addressing counsel's performance." *People v. Hale*, 2013 IL 113140, ¶ 17. That is what the majority has done here, as it chose to proceed directly to the question of whether defendant was prejudiced by counsel's failure to raise the argument at issue, *i.e.*, whether the argument was legally sound. This path, however, leads us to consider a constitutional question we need not have reached, which appears to contradict the admonition that "courts must avoid reaching constitutional issues unless necessary to decide a case." *People v. Bass*, 2021 IL 125434, ¶ 30.

¶ 94 This case is also not an ideal vessel for deciding this issue because there are gaps in the factual record, which is unsurprising given that the issue was not raised below. For example, we do not know whether the cannabis here was found in a container or whether that container was—as far as humans are concerned—odor proof. If so, we do not know whether the dog here was able to detect the smell of cannabis in such a container even if humans could not. These facts may or may not be important to the ultimate analysis, but the absence of such information simply demonstrates that this is not an ideal case to reach an issue that need not be reached.

¶ 95         Consequently, I concur in the affirmance of the trial court's ruling on the motion to suppress and the relief afforded defendant in connection with his assessment waiver, but for the reasons stated above, I would have resolved the ineffective assistance argument on the first prong of the analysis.